**Alan F. GERSMAN, et al., Appellants,**

v.

**GROUP HEALTH ASSOCIATION, INC., Appellee.**

**No. 89–5482.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 12, 1992.

Decided Sept. 15, 1992.

On Remand from the United States Supreme Court.

Douglas B. Huron, with whom David H. Shapiro, Washington, D.C., was on the brief, for appellants.

Anita Barondes, with whom Peter Chatilovicz, Ronald A. Lindsay and Christopher A. Weals, Washington, D.C., were on the brief, for appellee.

Stuart M. Gerson, Asst. Atty. Gen., with whom Jay B. Stephens, U.S. Atty., Mar-

leigh D. Dover and Jacob M. Lewis, Attys., Dept. of Justice, Washington, D.C., were on the brief, for amicus curiae.U.S., urging that this Court reinstate its prior judgment on the grounds that the Civil Rights Act of 1991 not be retroactively applied in this case.

Robert E. Williams and Douglas S. McDowell, Washington, D.C., were on the brief for amicus curiae Equal Employment Advisory Council, urging that this Court hold that the Civil Rights Act of 1991 does not apply to cases pending on the date of enactment.

Jill L. Kahn, New York City, for Anti-Defamation League of B'Nai Brith, Elliot Mincberg, Washington, D.C., for People for the American Way, Charles Stephen Ralston, New York City, and Kerry Scanlon, Washington, D.C., for NAACP Legal Defense and Educational Fund, and Richard T. Seymour, Washington, D.C., for Lawyers' Committee for Civil Rights Under the Law were on the joint brief for amici curiae, urging that section 101 of the Civil Rights Act of 1991 applies to this case.

Before WALD, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting Opinion filed by Circuit Judge WALD.

SENTELLE, Circuit Judge:

■ When last we considered this case, we affirmed the judgment of the District Court dismissing appellants' complaint for failure to state a claim on which relief could be granted. We now reconsider that decision on remand from the Supreme Court in light of the Civil Rights Act of 1991. Because we find pertinent portions of that Act do not apply retroactively, we conclude that our original opinion remains a valid statement of applicable law. Thus, we again affirm the District Court's dismissal.

## I. Background

### A. Factual Background and Procedural History

As indicated above, this case is on a return visit to our Court. While the facts are discussed at some length in our prior opinion, *Gersman v. Group Health Ass'n, Inc.*, 931 F.2d 1565 (D.C.Cir.1991), and the original District Court decision by the same name, 725 F.Supp. 573 (D.D.C.1989), we will sketch them here briefly as a foundation for the further discussion of the case's procedural history which follows.

Alan Gersman and Computer Security International, Inc. ("CSI"), of which he is president (collectively "appellants" or "CSI"), brought suit against Group Health Association, Inc. ("GHA" or "appellee") under 42 U.S.C. § 1981, alleging that GHA had wrongfully terminated a contract with CSI in 1987 because its president was Jewish.[1] The District Court held that neither the individual nor the corporate plaintiff had standing. 725 F.Supp. at 577–78. The District Court alternatively held that the Supreme Court's decision in *Patterson v. McClean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), governed the case; that under *Patterson*, § 1981 afforded relief only for discrimination in the formation of contracts; and that therefore, plaintiff's allegations of a discriminatory termination stated no claim. *Id.* at 574–76.

On appeal, we concluded that the District Court was correct on both grounds as to Gersman, but held that CSI had standing. We nonetheless affirmed because we agreed that *Patterson* governed, and that under *Patterson*, CSI had failed to state a claim. *Gersman*, 931 F.2d at 1572–73.

Thereafter, appellants sought *certiorari* to the Supreme Court. On January 27, 1992, the Supreme Court granted the writ of *certiorari* but did not approach the merits. Rather, it vacated the judgment and remanded the case to this Court "for fur-

---

1. Appellants also claimed under the District of Columbia Human Rights Act, D.C.Code §§ 1–2501 *et seq.* Because the changes in the law prompting the Supreme Court to remand our earlier decision have no effect on the dismissal of that claim, we will not further discuss it.

ther consideration in light of the Civil Rights Act of 1991." —— U.S. ——, ——, 112 S.Ct. 960, 960, 117 L.Ed.2d 127 (1992).

### B. *The Statutory Framework*

At the time of our prior decision, 42 U.S.C. § 1981 was the only United States statute arguably reaching the conduct alleged in this case. That statute guarantees the right to "make and enforce contracts" under the "equal benefit of all laws...." In *Patterson,* the Supreme Court interpreted the contract clause of the statute as meaning what it says, but no more. That is, § 1981 was held to apply to the formation of contracts, but not "to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." 491 U.S. at 171, 109 S.Ct. at 2369. In our original *Gersman* decision, we applied *Patterson* to the facts of this case and held that the complaint stated no claim under § 1981.

After the entry of our decision but while CSI's petition for *certiorari* was still pending before the Supreme Court, Congress enacted the Civil Rights Act of 1991. That Act included a provision adding two new subsections to § 1981. Subsection b provides:

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and *termination* of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

PUB.L. No. 102–166, § 101, codified at 42 U.S.C. § 1981 (emphasis added). The essential question for us today is whether that subsection applies retroactively to pending cases which seek redress under § 1981 for conduct occurring prior to its enactment.

### II. ANALYSIS

Unsurprisingly, CSI argues that the Civil Rights Act of 1991, or at least the pertinent provision, applies retroactively. Equally predictably, GHA argues that it does not. Both assert presumptions drawn from Su-preme Court decisions. While we will trace the origin and reasoning of these presumptions at greater length below, we introduce each briefly here. Appellants rely on *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), which asserted "the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."

GHA argues from *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), which stated that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."

### A. *Congressional Intent*

We are thus apparently trapped between opposed walls of presumption directed by the Higher Authority. Initially, the language of both presumptions appears to open a possible line of interpretive escape; each presumption applies only in the absence of statutory terms clearly directing the choice between retroactive and prospective application.

Each party here argues that Congress has set such guideposts. Each party points to some of them. Unfortunately, the guideposts point in conflicting directions. Appellants offer three parts of the Civil Rights Act of 1991 bearing on the question at hand: (1) § 101 itself; (2) the general effective date of the Act set forth in § 402(a); and (3) §§ 109(c) and 402(b), which address questions of retroactivity. As appellants see it, the language of § 101 saying that "the term 'make and enforce contracts' includes the ... termination of contracts," coupled with the enacting language of § 402(a), "[e]xcept as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment," establishes the statute's retroactivity. They argue that because the statute's enactment date is November 21, 1991 and the Act contains no other language of prospectivity, courts ad-

dressing cases after the effective date should apply § 101, whether the conduct under adjudication occurred before or after the enactment. It is not apparent to us that this is anything more than a restatement of the *Bradley* presumption.

Appellee argues the contrary from the same language. That is, appellee asserts the "take effect upon enactment" language in § 402(a) is evidence of congressional intent that the amendment apply prospectively only. In appellee's view, the District Court rehearing the controversy between Patterson and the McClean Credit Union interprets this provision correctly by holding that "the four words 'take effect upon enactment' must be interpreted to indicate a beginning point ... from which date the Act and its amendments would be operative on events coming within their scope, but having no effect on events occurring before that date as the Act was not operative prior to November 21, 1991." *Patterson v. McLean Credit Union*, 784 F.Supp. 268, 273–74 (M.D.N.C.1992). *Accord Franklin v. New Mexico*, 730 F.2d 86, 87 (10th Cir. 1984) (statutory language that " 'amendments made by this section shall become effective on the date of the [statute's] enactment' ... indicate[s] an intent for prospective application of the amendment.").

Appellee goes on to argue that we should read the "take effect upon enactment" language as evidencing a congressional intent to preclude retroactive application because Congress has expressed itself quite clearly in other statutes where it intended retroactive application. They offer us by way of example the Federal Home Loan Bank Act, 12 U.S.C. § 1439a (all monies deposited pursuant to the statute shall be available "retroactively as well as prospectively"); Black Lung Benefits Act, 30 U.S.C. § 945(a)(1) & (c) (providing for processing of benefit claims "pending on, or denied on or before" the effective date and awarding benefits "on a retroactive basis").

Again, it would seem that this argument is no more than a restatement of the *Bowen* presumption. Thus, after we examine the language of the relevant section and the enacting section, we are left with each

side arguing that Congress has expressed an intent to apply the statute in a manner consistent with that side's view because it has not given us language clearly expressing a contrary intent. Appellants thus come back around to the *Bradley* presumption from which they started and, likewise, appellee returns to the *Bowen* presumption.

Once before in considering the apparent inconsistency in presumptions established by the *Bradley* and *Bowen* decisions, we noted that an act stating "only when ... amendments 'become effective' " but not stating "whether they apply to conduct preceding the specified date or to litigation pending on that date," is ambiguous and "does not *require* us to apply" the amendments to conduct preceding the enactment or to litigation pending at the day of enactment. *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 n. 6 (D.C.Cir. 1990) (Thomas, J.). Consistent with our prior decision, we can find no unambiguous answer to the retroactivity question in the enacting language here.

Appellants' argument from §§ 109(c) and 402(b) carries a bit more substance, but only a bit. Section 109 extends the coverage of Title VII and the Americans with Disabilities Act to extraterritorial employment. Subsection (c) provides that "the amendments made by this section shall not apply with respect to conduct occurring before the date of the enactment of this act." Subsection 402(b) is contained in the same section as the general effective date. The subsection specifies that "notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983." The striking specificity of this last subsection was directed toward *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), the case in which the Supreme Court clarified the burden of proof rules in disparate impact cases under Title VII. All parties agree that Congress enacted § 105 of the Act with the express intent to effect

**890**

a shifting of the burden of proof in disparate impact cases.

Appellants argue that the inclusion of express language against retroactivity in §§ 109(c) and 402(b) should convince us that Congress intended retroactive application of the rest of the Act under the Supreme Court's caution that "no provision [of a statute] should be construed to be entirely redundant," *Kungys v. United States*, 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988). As appellants further note, the Supreme Court has elsewhere advised: "[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Mackey v. Lanier Collection Agency*, 486 U.S. 825, 837, 108 S.Ct. 2182, 2189, 100 L.Ed.2d 836 (1988).

However, given the convoluted legislative history of this Act and the war of interests firing at each other across the floor of both legislative houses, one might view these two subsections not as redundancies, but rather as insurance policies. Senator Dole, a principal proponent of the inclusion of § 402(b), which had been inadvertently omitted from the Senate version of the Act, expressly argued that "[a]bsolutely no inference is intended or should be drawn from the language of this [section] that the provisions of the Act or the amendments it makes may otherwise apply retroactively to conduct occurring before the date of enactment of this Act." 137 CONG.REC. S15,953 (daily ed. Nov. 5, 1991). Likewise, Senator Danforth, recognized by appellants themselves as "the Senator most responsible for passage of the Civil Rights Act of 1991," Brief for Appellants at 16, stated that the section "should not be read in derogation of the sponsors' intention not to provide for retroactive effect...." 137 CONG.REC. at S15,483 (daily ed. Oct. 30, 1991). On the House side, Representative Hyde assured his colleagues that the section was "unnecessary" and "surplusage" and that it did "not accomplish or achieve a thing and it should not be the subject of so much excitation." 137 CONG.REC. H9,512 (daily ed. Nov. 7, 1991). *See also* 137 CONG. REC. S15,966 (daily ed. Nov. 5, 1991) (remarks of Senator Gorton) ("the language in question does no more than reaffirm for one specific case the more general mandate of the bill that the civil rights amendments will be applied prospectively").

We hasten to say that we do not rely on these snippets of legislative history as definitive evidence of congressional intent. Appellants offer language from other sections with no direct bearing on the question of retroactivity of § 101(b), and argue that a failure to apply § 101(b) retroactively attributes to Congress an intent to insert redundancy into the Act. We offer the legislative history only to illustrate that such an intent is by no means an impossibility. Although it is helpful in construing one section of a statute to test whether a proffered interpretation would render another section surplusage, it is not conclusive. Given the potentially drastic impact of retroactivity of the disparate impact section on the *Wards Cove* defendants, it is not unthinkable that legislators wished to reassure the employers that they would not face recoveries of back pay plus interest from some time in the early 1970s for conduct committed twenty years or so before the passage of the statute.

Although the legislative history we offer above does no more than illustrate the possibility that Congress may have intended such an insurance policy, it also does no less. At the end of our examination, we remain where we began. Congress has not provided a clear expression of its intent as to the retroactive or prospective application of § 101(b) in the language of the statute.

**B.** *Legislative History*

Even as each litigant offers us sections of legislative language to support opposing views of congressional intent on the retroactivity question, so do they and their supporting *amici* offer segments of legislative history. We examine their offerings, but we caution at the outset that we do so with much reluctance. At its best, legislative history is an undependable guide to the meaning of a statute. In the first place, we must remember that it is the meaning of the statute, and not the disembodied

intent of the legislature, that we seek. "As Justice Holmes remarked, 'we do not inquire what the legislature meant; we ask only what the statute means.'" Starr, *Observations About the Use of Legislative History*, 1987 DUKE L.J. 371, 378 (quoting O.W. Holmes, *The Theory of Legal Interpretation* in **Collected Legal Papers,** 207 (1920)).

We offer this observation not merely for its cleverness, but also for its substance. It is only the statute itself that is law. A statement by a single member of the legislature or a report by a single committee (or even by an entire house) is not. The Supreme Court has noted that a bill is not law until it is passed by both the Houses and presented to the President for his approval, or re-passed by two-thirds of *each* House after his disapproval. *INS v. Chadha*, 462 U.S. 919, 945–46, 103 S.Ct. 2764, 2781, 77 L.Ed.2d 317 (1983) (citing U.S. CONST. art. 1, sec. 1 & sec. 7 cl. 2, 3).

With full awareness of the warning signs, we walk through the mine field of legislative history in search of congressional intent only with grave trepidation. Once there, we find that the cautions were never more warranted. Many versions of the Civil Rights Act were offered, many were rejected. One was passed, only to be vetoed. Finally, after much amendment, compromise, and rhetoric, Congress enacted the bill that the President signed. Along the way, many representatives and many senators speaking for various constituencies made a variety of remarks. Never have we been so convinced of the wisdom of the late Judge Leventhal's observation that "reviewing legislative history is like looking over the crowd at a party and picking out one's friends." *See* Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 IOWA L.REV. 195, 214 (1983). In the present case, each side introduces us to its own favorite acquaintances.

Appellants first point us to the historic fact that Representative Michel offered a substitute bill for the Civil Rights Act of 1991. That substitute contained a two-sentence provision on the effective date:

This act and the amendments made by this act should take effect upon enactment. The amendments made by this act shall not apply to any claim arising before the effective date of this act.

137 CONG.REC. H3,898 (daily ed. June 4, 1991). As the version ultimately adopted by Congress contained a one-sentence enactment clause identical to the first sentence in the Michel substitute, but did not contain the second sentence, appellants argue that we should infer that Congress expressly rejected the idea embodied in the second sentence that the Act does not apply to deeds done before its effective date. From this they would then have us reason that Congress must have expressly intended the opposite; that Congress did intend to regulate deeds done before the passage of the Act. *See generally Russello v. United States*, 464 U.S. 16, 23–24, 104 S.Ct. 296, 301, 78 L.Ed.2d 17 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended."). Unfortunately, this argument is little more than a rehash of the *Bradley* presumption: in the absence of a contrary comment, the Act applies retroactively.

For the most part, however, appellants, with commendable candor, note that the bill, having followed a tortuous path to enactment, did not leave behind the more useful footprints of legislative history, such as committee reports of single houses or a conference report. The House of Representatives acted first and passed a comprehensive bill. The Senate deliberated without the benefit of the normal committee process, attempting to fashion a proposal that would command the support of a veto-proof bipartisan majority of Senators. The House simply took up and passed the Senate bill without conference.

Both Senator Danforth, a principal Republican sponsor of the final bill, and Senator Kennedy, a principal Democratic sponsor, indicated that the legislative history had little utility. Danforth: "Whatever is said on the floor of the Senate about a bill is the view of the Senator who is saying it.

And if it is not written into legislative language, it does not necessarily bind and probably does not bind anybody else, including the 30–some odd cosponsors of the legislation." 137 CONG.REC. S15,325 (daily ed. Oct. 29, 1991). Kennedy: "It will be up to the courts to determine the extent to which the bill will apply to cases and claims that are pending on the day of enactment." 137 CONG.REC. S15,485 (daily ed. Oct. 30, 1991).

Appellee nonetheless presents several of its "friends." Not the least of these is the President's veto message of the 1990 Act, which specifically singles out "unfair retroactivity rules" as a reason for the veto. President's Message to the Senate Returning Without Approval the Civil Rights Act of 1990, 26 WEEKLY COMP.PRES.DOC. 1632, 1634 (Oct. 22, 1990). Appellee reasons that the subsequent signing by the President of the 1991 Act indicates understanding by him—one of the three parties to its enactment—that no such retroactivity was intended.[2]

Appellee further offers us reasoning not unlike the argument appellants advanced with reference to Representative Michel's substitute. H.R. 1, rejected by the substitution of the Senate version, contained explicitly retroactive transition rules. As the final version did not, appellants argue that we should conclude that Congress had no intention to make the Act retroactive. We should therefore hold, they argue, that Congress intended it to be prospective only. See Fray v. Omaha World Herald Co., 960 F.2d 1370 (8th Cir.1992) (concluding that legislative history clearly indicates that the Civil Rights Act of 1991 should be applied prospectively). This last step sounds a great deal like the presumption advanced in Bowen. It does not sound like very much more.

Appellee goes on to offer us numerous statements placed in the record by numerous members of the Congress after the statute's enactment. As we have noted before, a "contradiction between [congress-

men on opposite sides of a question of legislative interpretation] need not dismay us, nor need we seek to resolve it." Antolok v. United States, 873 F.2d 369, 377 (D.C.Cir.1989). Such a contradiction "may simply remind us once again that

> an endemic interplay, in Congress, of political and legislative consideration ... makes it necessary for judges to exercise extreme caution before concluding that a statement made in floor debate, or at a hearing, or printed in a committee document may be taken as statutory gospel."

Id. (quoting International Bhd. of Elec. Workers, Local Union No. 474 v. NLRB, 814 F.2d 697, 717 (D.C.Cir.1987) (Buckley, J., concurring)). More bluntly put, a single member may be attempting to reassure his own constituency or even to create legislative history for citation by courts. See generally International Bhd. of Elec. Workers, 814 F.2d at 715–20 (Buckley, J., concurring).

To our minds the most convincing floor statement is one presented by appellants:

> I simply want to state that a court would be well advised to take with a large grain of salt floor debate and statements placed into the Congressional Record which purport to create an interpretation for the legislation that is before us.

137 CONG. REC. S15,325 (daily ed. Oct. 29, 1991) (statement of Senator Danforth).

As the reader may have by now surmised, we do not find the legislative history to resolve the question of legislative intent. We are therefore left where we began this analysis. That is, appellants principally rely on the Bradley presumption. Appellee principally relies on the Bowen presumption. They are in apparent conflict.

C. The Conflicting Presumptions

Before attempting to determine which of the apparently conflicting presumptions govern the case before us, we will review at some greater length the two lines of authority. In Bradley v. Richmond School Board, 416 U.S. 696, 94 S.Ct. 2006,

**2.** The three parties to which we refer are the two Houses necessary for bicameral enactment and the President necessary for presentment.

40 L.Ed.2d 476 (1974), several black plaintiffs had brought an action to compel desegregation of the public schools of Richmond, Virginia. During the progress of the litigation, the school board conceded that the plan under which it had been operating was not constitutional. After further proceedings concerning the remedy, the district court entered a judgment in favor of the plaintiffs, which included a fee award. The school board appealed from the award of fees.

Following initial submissions of the case to the Court of Appeals but before its decision, Congress enacted § 718 of the Education Amendments of 1972, 20 U.S.C. § 1617 which granted federal courts authority to award attorneys fees to a prevailing party in a school desegregation case. The Fourth Circuit, noting that no orders were pending or appealable before the district court on the effective date of the statute, ruled that § 718 did not apply to services rendered prior to its effective date. The Supreme Court reversed.

In analyzing the retroactivity question, the *Bradley* Court looked first to the words of Chief Justice Marshall in *United States v. Schooner Peggy*, 1 Cranch 103, 2 L.Ed. 49 (1801). In that case Marshall had noted for the Court that the "general rule" is that "an appellate court is only to inquire whether a judgment, *when rendered*, was erroneous or not." *Id.* at 110 (emphasis supplied). But the Court further noted, "if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs," the new law must be obeyed. *Id.*

The Court went on to qualify that obligation, however, by recognizing that "[i]t is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties...." *Id.* at 110. But the *Schooner Peggy* case was not a "mere private case between individuals." It involved condemnation following seizure of a French vessel by an American ship. During the pendency of the case on appeal to the Su-

preme Court from the Circuit, the two nations entered a convention "providing in part: 'property captured and not yet *definitively* condemned, or which may be captured before the exchange of ratification ... shall be mutually restored.'" *Bradley*, 416 U.S. at 712 n. 16, 94 S.Ct. at 2016 n. 16 (quoting *Schooner Peggy*, 1 Cranch at 107 (emphasis in *Bradley*)). This being the case, the *Schooner Peggy* Court went on to state that "in great national concerns, ... the Court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside." 416 U.S. at 712, 94 S.Ct. at 2016 (quoting *Schooner Peggy*, 1 Cranch at 110).

Obviously, there is some distance between the *Schooner Peggy* ruling, establishing that the law at the time of the appellate hearing applies in cases of great national concern but is to be "struggled against" in cases between private parties, and a flat presumption that laws apply retroactively. In bridging that gap, the *Bradley* Court relied on only one case between the 1801 decision and its own 1974 holding. In that one case, *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), the Court ruled in more general terms that "an appellate court must apply the law in effect at the time it renders the decision." *Id.* at 281, 89 S.Ct. at 526.

In the *Thorpe* decision, after the plaintiff Municipal Housing Authority had obtained an eviction order from a state court, and after that order had been affirmed by the state supreme court, *Housing Authority of Durham v. Thorpe*, 267 N.C. 431, 148 S.E.2d 290, *cert. granted*, 385 U.S. 967, 87 S.Ct. 515, 17 L.Ed.2d 432 (1966), the Department of Housing and Urban Development published a circular ordering new procedural prerequisites for such an eviction. The United States Supreme Court then remanded to the Supreme Court of North Carolina "for such further proceedings as [might] be appropriate in the light of" the Housing and Urban Development directive. *Thorpe v. Housing Authority of Durham*, 386 U.S. 670, 673–74, 87 S.Ct. 1244, 1246,

18 L.Ed.2d 394 (1967) (per curiam). The North Carolina Supreme Court reaffirmed its original decision at 271 N.C. 468, 157 S.E.2d 147 (1967), *sub. nom. Housing Authority of Durham v. Thorpe.*

The United States Supreme Court again granted *certiorari* and this time reached the retroactivity issue. Relying on *Schooner Peggy,* the Court held that "the general rule ... is that an appellate court must apply the law in effect at the time it renders its decision." 393 U.S. at 281, 89 S.Ct. at 526. In its analysis of Thorpe, the *Bradley* Court reaffirmed that the decision "stands for the proposition that even where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." 416 U.S. at 715, 94 S.Ct. at 2018.

The *Bradley* Court went on to note, as we did in our brief discussion above, that this presumption would apply only "in the absence of clear legislative direction to the contrary...." 416 U.S. at 715, 94 S.Ct. at 2018. Moreover, it suggested a remaining vitality to Chief Justice Marshall's concern about retroactivity in " 'mere private cases between individuals.' " 416 U.S. at 718, 94 S.Ct. at 2019 (quoting *Schooner Peggy, supra,* at 110). The Court also noted possible exceptions to retroactivity in cases where it could cause a party to suffer "manifest injustice." 416 U.S. at 716, 94 S.Ct. at 2019 (citing *Thorpe,* 393 U.S. at 282, 89 S.Ct. at 526 (in turn citing *Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964))). In expositing its concern for the disruption of the legal relationship between private parties, the Court suggested that possible injustices resulting from retrospective application would include infringement upon or deprivation of "a right that had matured or become unconditional." 416 U.S. at 720, 94 S.Ct. at 2020 (citing *Greene v. United States,* 376 U.S. at 160, 84 S.Ct. at 621). Finally, the

*Bradley* Court implied that such manifest injustice would occur where the retrospective application would impose "new and unanticipated obligations ... without notice or an opportunity to be heard." 416 U.S. at 720, 94 S.Ct. at 2021.

Appellants argue that none of these exceptions applies and therefore that the *Bradley* presumption should govern. Unfortunately for appellants (and perhaps for our ease of decision, although the question of the application of the exceptions may not be as simple as appellants assume), that is not the end of the Supreme Court's treatment of the retroactivity question. In *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), the Supreme Court held, "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.* at 208, 109 S.Ct. at 471. In *Bowen,* the Secretary of Health and Human Services had promulgated new regulations setting limits on the level of reimbursement allowable for Medicare costs. The Secretary attempted to apply these limitations retroactively. In the language quoted above, the Supreme Court affirmed the Court of Appeals and District Court decisions denying the Secretary's retroactive application. Justice Kennedy, writing for a unanimous Supreme Court,[3] did so without citing either *Bradley* or *Thorpe.*

The *Bowen* Court did, however, cite a long line of cases supporting its presumption against retroactivity—a line not overruled in either *Bradley* or *Thorpe. See, e.g., Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964)[4]; *Claridge Apartments Co. v. Commissioner,* 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944); *Miller v. United States,* 294 U.S. 435, 439, 55 S.Ct. 440, 441–

---

**3.** Justice Scalia wrote a separate concurrence but expressly "agree[d] with the Court that general principles of administrative law suggest that ... the Medicare Act ... does not permit retroactive application of the ... cost-limit rule." 488 U.S. at 216, 109 S.Ct. at 475 (Scalia, J., concurring).

**4.** The *Bradley* Court did cite *Greene* as an example of a case where "manifest injustice" caused an exception to its perceived presumption of retroactive application. 416 U.S. at 716–17, 94 S.Ct. at 2019.

42, 79 L.Ed. 977 (1935); and *United States v. Magnolia Petroleum Co.*, 276 U.S. 160, 162–63, 48 S.Ct. 236, 237, 72 L.Ed. 509 (1928).

To take the oldest from the *Bowen* Court's list, in the *Magnolia Petroleum* case, the Supreme Court considered an amendment to the Revenue Act affecting the computation of interest on refunds. The Commissioner of Internal Revenue had calculated interest due based on the statute in effect at the time of the payment. The taxpayer contended that interest should be computed according to the later enactment. In rejecting the taxpayer's contention, the unanimous Supreme Court held, "[s]tatutes are not to be given retroactive effect or construed to change the status of claims fixed in accordance with earlier provisions unless the legislative purpose so to do plainly appears." 276 U.S. at 162–63. In support of this proposition, the *Magnolia Petroleum* Court cited a line of cases dating back to *United States v. Heth*, 3 Cranch 399, 413, 2 L.Ed. 479 (1806) ("[w]ords in a statute ought not to have a retrospective operation, unless they are so clear, strong, and imperative, that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied.").

In fact, as one of our sibling circuits has noted, the principle of legislative prospectivity began with Roman civil law and extended forward "through the centuries [of] venerable common law commentators such as Bracton, Cope, Blackstone, and Sir Francis Bacon." *Fray v. Omaha World Herald Company*, 960 F.2d 1370, 1374 (8th Cir.1992) (citing Smead, *The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence*, 20 Minn.L.Rev. 775, 775–81 (1936)). As the *Fray* Court further noted, prior to the *Thorpe* decision "this was a long and well established principle of American jurisprudence as well...." *Id.*

In fact, the Supreme Court has stated more than once that

> [T]he *first* rule of construction is that legislation must be considered as addressed to the future, not to the past ... a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be "the unequivocal and inflexible import of the terms and the manifest intention of the legislature."

*Greene v. United States*, 376 U.S. at 160, 84 S.Ct. at 621–22 (quoting *Union Pacific Railroad Co. v. Laramie Stockyards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913)). As the Eighth Circuit noted in *Fray*, "the Supreme Court destabilized this rather settled doctrine in *Thorpe* ... and again in *Bradley*...." 960 F.2d at 1374. Unfortunately, as we noted above, the *Bradley* and *Thorpe* decisions do not overrule the prospective presumption lines and the *Bowen* Court neither overrules nor cites *Bradley* and *Thorpe*. Thus, the two presumptions continue to exist in apparent inconsistency.

The problem posed by the conflicting lines surfaced in *Kaiser Aluminum and Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). There, the Court considered an amendment to 28 U.S.C. § 1961 changing the rate at which post-judgment interest should be calculated passed after the entry of a judgment. Justice O'Connor, for the majority, recognized the two presumptions and the "apparent tension" between "the rule articulated in *Bradley*" and the "generally accepted axiom" reaffirmed in *Bowen*. 494 U.S. at 837, 110 S.Ct. at 1577. The Court nonetheless did not find it necessary to "reconcile the two lines of precedent" because the Court found clear congressional intention that the amendment to § 1961 was to apply prospectively only. *Id.*

However, four justices of the Court did not find congressional intent to be nearly so clear as did the majority. Justice White, writing for himself and Justices Marshall, Brennan, and Blackmun, determined that "the tension" between *Bradley* and *Bowen* "is more apparent than real...." 494 U.S. at 864, 110 S.Ct. at 1591 (White, J., dissenting). In his view—which admittedly we oversimplify—the *Bowen* presumption applies to prevent " 'altering the *past* legal consequences of past actions.' " *Id.* at 866, 110 S.Ct. at 1592 (emphasis in original)

(quoting *Bowen,* 488 U.S. at 219, 109 S.Ct. at 477 (Scalia, J., concurring)). The *Bradley* presumption, on the other hand, is in Justice White's view a choice-of-law rule making it the general practice that changes in law apply to pending cases. Justice White would not apply this choice-of-law rule mechanically, but would examine the status of rights involved and the public interest implicated.

Justice Scalia, who joined Justice O'Connor's majority opinion in *Kaiser Aluminum,* nonetheless wrote separately to treat at length the *Bradley–Bowen* problem. To him the "two lines of cases are not merely ... in 'apparent tension' ... they are in irreconcilable contradiction...." 494 U.S. at 841, 110 S.Ct. at 1579 (Scalia, J., concurring). Justice Scalia's concurrence catalogs at length the history of the presumption against retrospective operation, concluding that "[d]uring ... more than 150 years of doctrinal certainty," the Supreme Court denied retroactive application to new statutory law except when "the statute affirmatively so required." *Id.* at 844, 110 S.Ct. at 1580. He then reviewed the *Thorpe–Bradley* line and argued that those cases misinterpreted and misapplied *Schooner Peggy.* In Justice Scalia's view, *Schooner Peggy* stands for the proposition that only when Congress *"plainly says"* that legislation has retroactive effect are courts to depart from "the ordinary presumption which courts will 'struggle hard' to apply" against retroactivity. *Id.* at 846–47, 110 S.Ct. at 1582 (emphasis in original) (quoting *Thorpe,* 393 U.S. at 281, 89 S.Ct. at 526). Without reiterating the entire argument, we note that Justice Scalia set forth a record of

(1) An unbroken line of precedent, prior to 1969, applying a presumption that statutes are not retroactive (except for repeal of penal provisions in *all* cases). (2) In 1969, with *Thorpe,* a departure from the tradition ... for cases in which the statute has been enacted after initial adjudication. (3) From 1969 to the present, (a) firm adherence to the prior tradition in cases not involving post-adjudication enactment, and (b) the expression of adherence to the new presumption in

post-adjudication enactment cases, but with only one case (*Bradley,* in 1974) where it seemingly produced a difference in outcome....

*Id.* at 853–54, 110 S.Ct. at 1985–86.

It is against this background that we must determine the retroactivity question in the present case.

## D. *Reconciliation and Application*

We might echo Justice Scalia's plea in his *Kaiser Aluminum* concurrence that the Supreme Court "eliminate the confusion of the past two decades" and unqualifiedly affirm the principle of construction to be applied in retroactivity cases. 494 U.S. at 858, 110 S.Ct. at 1588 (Scalia, J., concurring); *see also Luddington v. Indiana Bell Telephone Co.,* 966 F.2d 225 (7th Cir. 1992) (suggesting that the absence of a clear judicial retroactivity rule may provide an incentive for Congress to avoid addressing whether a new statute will have prospective or retroactive effect). We, however, obviously lack the power to overrule either *Bowen* or *Bradley* and therefore must find some principled way to determine which governs the case before us.

In our search we find persuasive and illuminating the exposition of Justice Scalia in his separate opinion in *Kaiser Aluminum.* As we discussed above, that separate opinion detailed how the historic line of Supreme Court decisions logically leads to a conclusion that new statutory law is presumed to apply prospectively except when "the statute affirmatively so require[s]." *Kaiser Aluminum,* 494 U.S. at 844, 110 S.Ct. at 1580. Persuasive as we find this, however, it remains the exposition of a single Justice and cannot overrule *Bradley* and *Thorpe.*

A further element of authority informing our decisionmaking is prior case law within our Circuit. While we have not spoken to the question of retroactivity of the Civil Rights Act of 1991, we have previously addressed the general retroactivity principle which must govern it. Indeed, one district court within this Circuit has applied our prior teachings to the question of re-

troactivity of another provision of the 1991 Act. In *Van Meter v. Barr*, 778 F.Supp. 83, 84–85 (D.D.C.1991), the district court held that the statute applied only prospectively, and further held that this conclusion was compelled by our decisions *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958 (D.C.Cir.1990), and *Wagner Seed, Inc. v. Bush*, 946 F.2d 918 (D.C.Cir.1991).

Indeed, the district court's decision in *Van Meter* was obedient to our language in those cases. In *Alpo*, as the *Van Meter* court noted, we stated:

> Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.

913 F.2d at 964 n. 6 (Thomas, J.) (quoting *Bowen v. Georgetown Univ. Hospital*, 488 U.S. at 208, 109 S.Ct. at 471). Likewise, in *Wagner Seed*, we stated that "[i]f the presumption against retroactivity is not rebutted by clear terms to the contrary ... then the statute applies only prospectively." 946 F.2d at 924. We cited an array of Supreme Court cases in support of this proposition. The *Van Meter* district court therefore was on firm ground when it held the presumption against retroactivity to be the law of this Circuit.

█ At first blush, it would appear that we, like the district court in *Van Meter*, should simply bind ourselves to our prior opinions and declare for *Bowen* over *Bradley*. We are, after all, bound by the decisions of prior panels of this Court "unless and until overturned by the court *en banc* or by Higher Authority." *Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 54 (D.C.Cir.1987) (Ruth B. Ginsburg, J., concurring). However, for two reasons, we do not deem ourselves to be so completely bound in the present case. First, the quoted language from *Alpo Petfoods* is candidly *dicta*. As we stated later

in the same footnote, "even if we were to apply the *Bradley* presumption and give the 1988 Act retroactive effect, the substance of our ... analysis would remain the same." 913 F.2d at 964 n. 6. In *Wagner Seed*, the *Bowen* analysis is not determinative of the result either, and therefore must be deemed not a holding, but rather a *dictum*, albeit an exceedingly ·strong one.[5] Binding circuit law comes only from the holdings of a prior panel, not from its dicta. *Cf. United States v. North*, 910 F.2d 843, 881 (D.C.Cir.1990) ("[w]e are bound only by prior *published opinions* of this Circuit and not by other means of deciding cases.").

Second, even if the language of *Alpo Petfoods* and *Wagner Seed* were holdings rather than dicta, we still would be left with the troubling fact that two unreversed decisions of the Higher Authority are contra. Therefore, although we conclude that the language of our prior decisions impels us toward a presumption of prospectivity, we cannot comfortably assert that we are fettered by them to that choice.

█ Thus, the greater weight of authority from the Supreme Court and the existing authority from this Circuit establish that as between the two propositions that statutes presumptively apply to pre-enactment conduct and that they presumptively apply only to post-enactment conduct, the latter prevails. That is, generally "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen*, 488 U.S. at 208, 109 S.Ct. at 471. In addition to conforming to the longest and largest line of Supreme Court decisions, this has the obvious salutary result that persons may know when they act the legal consequences of their actions. " '[R]etrospective laws are ... generally unjust; and ... neither accord with sound legislation nor with the

---

5. We do not mean by this to imply that the district court in any fashion erred in following our prior language. Had the Court above us given as clear guidance in the choice between *Bowen* and *Bradley* as we gave the district court, we would without doubt be following it today, even if it were in dicta. On the other hand, we

do not mean to imply affirmation of the *Van Meter* decision either. That case now pends before another panel of this Court. We do not have the full record before us, and they, not we, will of course determine the result in that controversy.

fundamental principles of the social compact.'" *Kaiser Aluminum v. Bonjorno*, 494 U.S. at 855–56, 110 S.Ct. at 1587 (Scalia, J., concurring) (quoting J. STORY, COMMENTARIES ON THE CONSTITUTION, § 1398 (1851)).

Nonetheless, that leaves us, as an inferior court, with the question of what to do with the presumption stated by *Thorpe* and *Bradley* in the highest court. We are not in fact the first circuit to wrestle with this problem. The Fifth, Sixth, Seventh, and Eighth Circuits have already dealt with the question of the retroactivity or prospectivity of the Civil Rights Act of 1991. *Fray v. Omaha World Herald Co.*, 960 F.2d 1370, 1374–78 (8th Cir.1992); *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363 (5th Cir.1992); *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225 (7th Cir.1992); *Mozee v. American Commercial Marine Serv. Co.*, 963 F.2d 929, 934–38 (7th Cir.1992); and *Vogel v. Cincinnati*, 959 F.2d 594, 597–98 (6th Cir.1992). All have held, as we do, that the Act does not apply retroactively.

In our holding, we are informed, as have been three of our sibling circuits, by the Supreme Court's decision in *Bennett v. New Jersey*, 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1985). *See Fray*, 960 F.2d at 1374; *Uncle Ben's*, 965 F.2d at 1374; and *Mozee*, 963 F.2d at 934.

In *Bennett*, the Supreme Court considered a controversy arising from efforts of the United States Secretary of Education to recover from the state of New Jersey federal grant funds allegedly misused during the years 1970–72. The statute governing the grants, 20 U.S.C. § 241(a) *et seq.* had been amended in 1978. The Third Circuit had held that standards set by the amendments should apply to determine the propriety of expenditures in previous years. *New Jersey Department of Education v. Hufstedler*, 724 F.2d 34, 36–37 (1983). The Supreme Court reversed, and in doing so, discussed *Bradley*. The Court noted that *Bradley* had held "a statutory provision for attorney's fees applied retroactively to a fee request that was pending when the statute was enacted." 470 U.S. at 639, 105 S.Ct. at 1560. The Court further noted the

*Bradley* Court's recognition of "the general principle that a court must apply the law in effect at the time of its decision...." *Id.* However, the *Bennett* Court distinguished *Bradley* and applied the 1978 amendments prospectively only. It did so offering alternative rationales. First, the Court noted that it

has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional.

*Id.* (quoting *Bradley*, 416 U.S. at 720, 94 S.Ct. at 2020). Further, the *Bennett* Court discussed the evidence of congressional intent, and noted that it did not appear that Congress "intended the substantive standards of the 1978 amendments to apply retroactively." 470 U.S. at 641, 105 S.Ct. at 1561. But most pertinently to the overarching question of the primacy of the *Bowen* presumption or the *Bradley* pronouncement, the *Bennett* Court stated that the limitation quoted above from the *Bradley* opinion "comports with another venerable rule of statutory interpretation, *i.e.*, that statutes affecting substantive rights and liabilities are presumed to have only prospective effect." 470 U.S. at 639, 105 S.Ct. at 1560, citing *United States v. Security Industrial Bank*, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982); *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964).

The Supreme Court in *Bennett* did not purport to overrule *Bradley*. But it noted that the *Bradley* decision concerned allowance of attorney fees, while acknowledging the continued vitality of the "venerable rule of statutory interpretation" followed in *Security Industrial* and *Greene* as applicable to "substantive rights and liabilities." 470 U.S. at 639, 105 S.Ct. at 1560. Therefore, we conclude that the Court has given us the basis upon which we must now distinguish the applicability of the two presumptions. The *Bowen* presumption must apply in the case of changes in substantive law. That being said, and *Bradley* still apparently being recognized by the Supreme Court, we agree with the Fifth Circuit that the *Bradley* presumption of

applicability of law as of the time of decision must pertain to "remedial provision[s]—not substantive obligations or rights under a statute." *Uncle Ben's,* 965 F.2d at 1374 (citing *Bennett,* 470 U.S. at 639, 105 S.Ct. at 1560).

The provision before the Court in *Bradley,* as noted in *Bennett,* applied to a remedy, not to the rights of the parties. The rights of the parties were the same before and after the change. The statutory amendment enlarged only the remedy. Likewise, in *Thorpe,* the amending statute altered procedural, not substantive, rights. Landlords had the same rights and limitations on eviction of tenants as before, but the required procedures had changed.[6] Not so in the present case. In *Johnson v. Uncle Ben's, Inc.,* the Fifth Circuit stated:

> Section 101 affects substantive antecedent rights. Under *Patterson,* § 1981 did not prohibit discrimination in promotions before the enactment of § 101. Section 101 extended § 1981 to such discriminatory conduct. We then presume that § 101 does not apply to conduct that occurred before its enactment, absent clear evidence to the contrary. There is no such clear evidence.

965 F.2d at 1374.

Likewise here. Under *Patterson,* § 1981 did not prohibit discrimination in termination of contracts. *Gersman v. Group Health Ass'n, Inc.,* 931 F.2d 1565, 1571. Section 101 extended § 1981 to that discriminatory conduct. Like the Fifth Circuit, we presume that a substantive statutory change such as § 101 does not apply to conduct that occurred before its enactment, absent clear evidence of congressional intent to the contrary. As we demonstrated above, there is no such clear evidence.

The fact, stressed by the dissent, that the conduct involved here occurred before the decision in *Patterson* is of no legal effect. It simply cannot be the law that retroactive application of a statute is governed by whether or not the parties reasonably, but mistakenly, believed that the law at the time of their conduct was what the law later became. One obvious problem with such a rule is that there is no way of determining in most cases what the parties mistakenly believed the law to be at the time of their conduct. Indeed, this is such a case. The dissent states, "because the new law was the same as what the parties reasonably understood the law to be before *Patterson,* there is no reason not to apply § 101 retroactively." Dissent at 908. Our colleague does not, however, explain how she knows what Group Health understood the law to be at the time of its termination of the contract with Gersman.

The Fifth Circuit dealt with this same argument in *Uncle Ben's,* and dispatched it quickly.

> As a matter of law, the rule announced in *Patterson* applies retroactively to UBI's conduct in 1974. *Lavender v. V. & B. Transmissions & Auto Repair,* 897 F.2d 805, 806–07 (5th Cir.1990). *Cf. James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). UBI is just as entitled to the preservation of its substantive interests under this rule as litigants whose conduct occurred after *Patterson* was decided. Any other holding would require unwieldy distinctions between classes of litigants based on the degree to which they relied on the legal regime

---

6. We recognize that this is not a wholly satisfactory distinction. To call the change in *Thorpe* "procedural" as opposed to "substantive" ignores the proposition suggested by Justice Scalia in his *Kaiser Aluminum* concurrence that *"Thorpe* could not possibly have come out the way it did under prior law." 494 U.S. at 848–49, 110 S.Ct. at 1583. Nonetheless, given the present guidance from the Supreme Court, and the continued vitality of the two lines of authority, we see no other resolution. Though the substantive/procedural distinction is imperfect, it at least recognizes the Supreme Court's authority

to interpret past and present law, and offers a standard for resolving retroactivity disputes on objective grounds. Adopting the "reasonable expectations test" advocated by the dissent would only promote unpredictable and subjective analyses. How this distinction and the *Bradley* exception for "manifest injustice" play out in the context of such major, though arguably remedial, changes as the right to jury trial and expanded damages under § 102(b) and (c) of the 1991 Act is for another day and another case, perhaps *Van Meter, supra.*

antedating the Civil Rights Act of 1991. We decline to embark on such an inquiry. 965 F.2d at 1374.

Other than substituting GHA for UBI and a citation from this Circuit—the original opinion in this case, 931 F.2d at 1565—for *Lavender*, we merely join the language of our sibling circuit. *See also Luddington v. Indiana Bell Telephone Co.*, 966 F.2d at 229–30.[7]

Nor do we share our dissenting colleague's apparent conclusion that the Fifth Circuit in *Landgraf v. USI Film Products*, 968 F.2d 427 (5th Cir.1992), retreated from its application of *Bowen* in *Uncle Ben's*. The *Uncle Ben's* panel concluded as we do today that the Supreme Court in *Bennett* impels us toward the conclusion that the *Bowen* presumption of prospective application of statutory amendments, not the *Bradley* presumption of retroactive application, applies in cases where the substantive law is changed. 965 F.2d at 1372–74. The language quoted from *Landgraf* by our colleague is not to the contrary. True, Judge Higgenbotham (also the author of the *Uncle Ben's* decision) did state for the court "the measure of manifest injustice under *Bradley* is not controlled by formal labels of substantive or remedial changes. Instead, we focus on the practical effects the amendments have upon the settled expectations of the parties." *Id.* 968 F.2d at 433. However, he did so, not in the context of determining which of the two conflicting presumptions applied, but rather to demonstrate that on the facts of the *Landgraf* case it did not matter. The amendments in question there would apply only prospectively in either event.

More specifically, the *Landgraf* panel was considering at that point whether § 102(a)(3), (b)(3), substantially expanding compensatory and punitive damage awards available in Title VII cases, would apply to pre-Act conduct. As the substantive-reme-

dial distinction drawn in *Uncle Ben's* might lead to the conclusion that the *Bradley* presumption in favor of retroactivity would apply, Judge Higgenbotham was pointing out that even if it did, its own built-in exception for "manifest injustice" would lead to prospective application of the amendment.

### SUMMARY AND CONCLUSION

It is the general rule that substantive statutory amendments do not apply to pre-amendment conduct. This holding is consistent with *Bradley* and *Thorpe*, which dealt with remedial and procedural amendments. The present case concerns a substantive amendment and pre-amendment conduct. The rights of the parties must be adjudicated as they were under the law prevailing at the time of the conduct. Therefore, we adopt our prior decision in *Gersman v. Group Health Ass'n, Inc.*, 931 F.2d 1565 (D.C.Cir.1991). The decision of the District Court is

*Affirmed.*

WALD, Circuit Judge, dissenting:

I agree with my colleagues that Congress' intention is unclear with respect to whether § 101 of the Civil Rights Act of 1991 ("Civil Rights Act" or "Act"), Pub.L. No. 102–166, § 101, 105 Stat. 1071, 1071–72, should apply retroactively to cases pending at the time it became effective. I also agree that *Bradley v. School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), remains the law and until a majority of the Supreme Court informs us otherwise, we must continue to apply it. Finally, I concur that, to say the least, the Supreme Court's guidance on retroactivity has not been all of one piece, *compare Bradley*, 416 U.S. at 715, 94 S.Ct. at 2018 ("[W]e must reject the contention that a change in the law is to be given effect in a

---

7. We would further note that it is far from altogether clear that the law before *Patterson* was universally perceived to be contrary to the *Patterson* holding. Every case the dissent cites from either the Supreme Court or this Circuit is offered for its dicta. There was apparently no holding upon which the parties could have re-

lied, even if their reliance were relevant. *See Luddington v. Indiana Bell Telephone Co.*, 966 F.2d at 229 ("the pre-*Patterson* 'legal regime' . . . was merely a set of lower-court decisions, constituting a stab in the dark concerning issues on which the Supreme Court had not yet ruled.").

pending case only when that is the clear and stated intention of the legislature.") *with Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) ("[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language plainly requires this result."), and that clarification of the proper principle of construction by the Court would aid us in deciding cases such as this one. I part company with my colleagues, however, on how best to reconcile *Bradley* with the cases that have come after it and, thus, on how to apply the *"Bradley* presumption" to the case before us. I conclude that the most satisfactory— although admittedly not the only defensible—reconciliation of the post-*Bradley* cases requires us, in the absence of a contrary direction from Congress, to apply the law in effect at the time we render our decision, unless we conclude that Congress would not intend us to apply the "new" law because that would upset the reasonable expectations of the parties concerning the legal consequences of their conduct at the time they acted. Because the law prior to the Supreme Court's decision in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), with respect to § 1981's applicability to postformation conduct was substantially identical to the law as enacted in § 101 of the Civil Rights Act, the retroactive application of that section to the parties in this case would not undermine the parties' reasonable expectations concerning the rights and obligations arising out of their conduct in October 1987. Accordingly, I dissent from the majority's holding that § 101 does not apply to the facts of this case.

## I.

In *Bradley,* the Court relied on "the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016. The question before the Court was whether § 718 of Title VII of the Emergency School Aid Act, which grants authority to a federal court to award a reasonable attorney's fee when appropriate in a school desegregation case, applied to cases pending on the effective date of the enactment. The amendment was passed while *Bradley* was pending before the court of appeals; after rehearing the case en banc, the appellate court decided that the attorney's fee amendment applied only to legal services rendered after the effective date of the Act.

The Supreme Court unanimously reversed. The Court read *Thorpe v. Housing Authority,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), to stand for "the proposition that even where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." *Bradley,* 416 U.S. at 715, 94 S.Ct. at 2018. According to the Court, the *Thorpe* rule applies in the absence of clear legislative intent to the contrary or the need to prevent "manifest injustice." *See id.* at 715–16, 94 S.Ct. at 2019. Explicating the latter exception, the *Bradley* opinion indicated that

> [t]he concerns expressed by the Court in *Schooner Peggy* and in *Thorpe* relative to the possible working of an injustice center upon (a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights.

*Id.* at 717, 94 S.Ct. at 2019. The *Bradley* Court then applied those criteria to the case before it. It first determined that the case was of more than private concern and that, with respect to the plaintiffs, the defendants were disproportionately able to protect their interests. *See id.* at 718–19, 94 S.Ct. at 2019–20. Moving to the second criterion, the Court emphasized that there was no danger "that injustice may arise from retrospective application of a change in law" because § 718 did not affect any right "that had matured or become unconditional." *Id.* at 720, 94 S.Ct. at 2020. Finally, the Court noted that this was not a case "where new or unanticipated obligations," *id.,* were imposed on parties because the new law "merely serve[d] to cre-

ate an additional basis or source for the Board's potential obligation to pay attorneys' fees." *Id.* at 721, 94 S.Ct. at 2021.

*Bradley*'s discussion of the principles governing retroactivity suggests that the Court's primary concern about the potential for injustice stemming from retroactive application of legislation revolves around the effect that such an application would have on the reasonable expectations of the parties concerning the nature of their rights and obligations at the time they acted. Thus, I believe that the core principle of *Bradley* may be summarized as follows: A court will presume, absent clear statutory language or legislative history to the contrary, that courts should apply the law in effect at the time they render their decisions, unless Congress would not intend the retroactive application of the new law because that would work an unfairness by upsetting the expectations of the parties concerning the legal consequences of their past conduct. As Judge Higginbotham has recently said, "The measure of manifest injustice under Bradley is not controlled by formal labels of substantive or remedial changes. Instead, we focus on the practical effects the amendments have upon the settled expectations of the parties." *Landgraf v. USI Film Products*, 968 F.2d 427, 433 (5th Cir.1992).[1] This principle is also consistent with the cases that have come after *Bradley*, even though some of those decisions have spoken in different terms.

My colleagues, however, disagree with me as to the effect of later cases on *Bradley*'s core principle. Specifically, they argue that the *Bradley* presumption was narrowed by *Bennett v. New Jersey*, 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), to apply only to procedural matters. In *Bennett*, the question was whether certain amendments relaxing the substantive standards for determining whether recipients misused federal educational grants should apply retroactively to grants made prior to the amendments. In a 6 to 2 decision, the Court reversed the decision of the Court of Appeals that had applied the new substan-

tive criteria retroactively, concluding that "absent a clear indication to the contrary in the relevant statutes or legislative history, changes in the substantive standards governing federal grant programs do not alter obligations and liabilities arising under earlier grants." *Id.* at 641, 105 S.Ct. at 1561. Justice O'Connor stated that "reliance on [the *Bradley* ] presumption in this context is inappropriate," *id.* at 638, 105 S.Ct. at 1559, because "[b]oth the nature of the obligations that arose under the Title I [of the Elementary and Secondary Education Act of 1965] program and *Bradley* itself suggest that changes in substantive requirements for federal grants should not be presumed to operate retroactively." *Id.* The Court recognized that *Bradley* had expressly acknowledged limits to the "general principle that a court must apply the law in effect at the time of its decision":

> "The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional." [*Bradley*, 416 U.S.] at 720 [94 S.Ct. at 2020]. This limitation comports with another venerable rule of statutory interpretation, *i.e.*, that statutes affecting substantive rights and liabilities are presumed to have only prospective effect.

*Bennett*, 470 U.S. at 639, 105 S.Ct. at 1560.

My colleagues have interpreted this passage from *Bennett* as having effectively modified the *Bradley* presumption such that it would henceforth not apply to statutes affecting substantive rights. Ordinarily, of course, such a change would make little difference: a law that affects substantive rights of the parties, if applied retroactively, will usually also upset the reasonable expectations of the parties concerning the legal consequences of their past conduct. But not always. In this instance, for example, there is no question that § 101 of the Civil Rights Act "affects substantive rights," but there is also little doubt that the reasonable expectations of

---

1. I do not, as the majority opinion mistakenly suggests, *see* Majority Opinion ("Maj.Op.") at 900, cite this quotation for anything other than what it says on its face.

the parties concerning the legal consequences of terminating a contractual relationship back in October 1987 on the basis of race included a possible cause of action under § 1981.[2] By reading *Bennett* and its gloss on *Bradley* to suggest that the inquiry ends when it is determined that the "new" law affects substantive rights, my colleagues transform an exception requiring a realistic appraisal of the dislocations that retroactivity may cause into a rather hollow, formal distinction between substantive and procedural or remedial changes in the law. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 853, 110 S.Ct. 1570, 1585, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring) ("I suppose it would be possible to distinguish between statutes that alter 'substantive rights and liabilities' directly, and those that do so only by retroactively adding a procedural requirement, the failure to comply with which alters the 'substantive rights and liabilities'—but I fail to see the sense in such a distinction."); *cf. Rowe v. Sullivan*, 967 F.2d 186, 194 (5th Cir.1992) (indicating that the Act's change in a Title VII statute of limitations period "has substantive attributes" because it would revive a right that would otherwise be extinguished); Michele A. Estrin, Note, *Retroactive Application of the Civil Rights Act of 1991*, 90 MICH.L.REV. 2035, 2062 (1992) (noting that the "lack of content to the distinction" between substance and process leads to contradictory results in similar cases). This formal distinction has no inherent connection to the value, the prevention of injustice through disturbance of reasonable reliance, that causes courts to pause before declaring new rules retroactive. *Cf. James B. Beam Distilling Co. v. Georgia*, —— U.S. ——, ——, 111 S.Ct. 2439, 2443, 115 L.Ed.2d 481 (1991) (Souter, J., joined by Stevens, J.) (noting that retroactivity of judicial decisions has been "attacked for its failure to take account of reliance on cases subsequently aban-

doned"). Further, in the circumstances of this case, my colleagues' criterion actually thwarts the attainment of what they correctly refer to as the "obvious[ly] salutary result that persons may know when they act the legal consequences of their action." Maj.Op. at 897; *see also* Estrin, Note, *supra*, at 2072–73 (1992) ("Congress restored the values and understandings developed over twenty-five years of federal court interpretations. These long-standing expectation interests and their subsequent reaffirmance by Congress outweigh the interests which arose during the two-year break with the past.... [T]h[e] decisions [overturned by the Act] disrupted expectations to a far greater extent than the restorative Civil Rights Act."). The majority's rule foists a legal regime on the parties that they could not have "known," much less relied upon, when they acted.

We would have to accept such an unfortunate result if *Bennett* clearly mandated the interpretation that the majority gives to it. In fact, however, their reading is not preordained and requires them to ignore several significant aspects of the *Bennett* decision.

First, it is clear from *Bennett* that the Court explicitly focused on *Bradley*'s concern with vested rights and the parties' expectations—what I have referred to as *Bradley*'s core principle—in analyzing the effect of a retroactive change in the substantive requirements to receive a federal grant. In concluding that such a change would impermissibly undermine the parties' expectations, the Court explicitly noted that the Department of Education's "right ... had matured or become unconditional because grant programs are 'much in the nature of a contract,'" *id.* 470 U.S. at 638, 94 S.Ct. at 1559 (quoting *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981)). The "'State chose to participate in

---

**2.** Conversely, while remedial or procedural changes do not generally upset expectations, in some cases they may. *See Landgraf v. USI Film Products*, 968 F.2d 427 (5th Cir.1992) ("There is a practical point at which a dramatic change in the remedial consequences of a rule works change in the normative reach of the rule it-

self."); *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225, 229 (7th Cir.1992) (Posner, J.) ("[Remedial, procedural, or evidentiary] changes can have as profound an impact on behavior outside the courtroom as avowedly substantive changes.").

the Title I program and, as a condition of receiving the grant, freely gave its assurances that it would abide by the conditions of Title I,'" *id.* at 638–39, 94 S.Ct. at 1559 (quoting *Bell v. New Jersey*, 461 U.S. 773, 790, 103 S.Ct. 2187, 2197, 76 L.Ed.2d 312 (1983)). Following *Bradley*'s lead, the Court concluded that the normal presumption in favor of current law should not be applied in such circumstances, for it is not reasonable to presume that Congress intended to rewrite the terms of the grant program and thereby upset the expectations of the Department of Education as to the obligations of the State of New Jersey at the time the funds were allocated. In sum, the Court explicitly referred to and applied the unadulterated *Bradley* rule and recognized that the facts of *Bennett* fell clearly within the articulated exception to the *Bradley* presumption.

Second, my colleagues treat the Supreme Court's allusion to the "venerable rule" distinguishing substantive rights from procedural or remedial rights as the crucial consideration in the Court's ruling in *Bennett*. Thus, they read the opinion as a reformulation of *Bradley*'s concerns about disturbing settled interests into the formal distinction between substantive and other laws, and then find that the Court intended the formal distinction to replace any individualized inquiry into the justice of applying a substantive rule retroactively. But Justice O'Connor did not simply refer to that "venerable rule of construction," decide which side of it the case fell on, and put down her pen. Rather, she immediately proceeded beyond her reference to that formal distinction to look at the "[p]ractical considerations" that suggested that changes in federal grant programs should not be retroactive. *Id.* at 640, 94 S.Ct. at 1560. After reviewing the real effect that retroactive application would have in the circumstances presented, the Court proclaimed that "[r]etroactive application of

changes in the substantive requirements of a federal grant program would deny both federal auditors and grant recipients fixed, predictable standards for determining if expenditures are proper," and would be "unworkable." *Id.* Thus, it was not simply that the changes were substantive—and, as noted above, would have disturbed reasonable expectations and thus fallen within *Bradley*'s exception—but also that such changes would cause practical difficulties *in the specific circumstances* presented to the Court that led it to its conclusion. Given *Bennett*'s consistent approach of looking at the specific effects retroactivity would have on expectations and sensible administration, that case should not be construed as relying on a bright line rule that considers the finding that a law is "substantive" conclusive without further inquiry.

Third, contrary to the majority's assumption, the Court in *Bennett* never stated that the exception to *Bradley* was *identical* to the principle that statutes affecting substantive rights will always apply prospectively. *Id.* at 639, 94 S.Ct. at 1560. Instead, the Court stated only that the exception to the *Bradley* presumption *"comports with* another venerable rule of statutory interpretation." *Id.* (emphasis added). The Court simply noted that the exception to the *Bradley* presumption and the "[ ]other venerable rule" were *consistent*. And, while they are consistent, the focus on vested rights and expectations underlying *Bradley* is narrower than the "venerable rule" that presumes that all changes in substantive rights and liabilities are only to be applied prospectively. If the *Bennett* Court had really intended to expand *Bradley*'s exceptions to include all substantive laws, as my colleagues suggest, rather than simply to point out that the exception is consistent with other rules of statutory construction, it could certainly have made that clearer.[3]

---

**3.** Finally, even if the *Bennett* Court meant to say that the *Bradley* exception was coextensive with the rule of construction it identified, the breadth of the "venerable rule" the Court intended to incorporate is open to question. The cases cited by the *Bennett* majority for the proposition that

legislation affecting "substantive" rights is presumed to be prospective are all vested-rights cases. Thus, the class of "substantive" rights that *Bennett* intended this rule to apply to may not have been any broader than the set of cases where parties had settled expectations of uncon-

*Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), also does not alter the conclusion that the core principle of *Bradley* is still the law of the land and applies to both substantive and procedural legislation. In *Bowen*, the Court considered whether the Department of Health and Human Services ("HHS") had the power retroactively to change the method of calculating the "wage index" factor used to compute hospital reimbursements under Medicare. The Court reasoned that since an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress, the validity of HHS's retroactive wage-index rule depended on whether the Medicare Act authorized retroactive rulemaking. The Court concluded that it did not. In support of that position, the Court stated:

> Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.

*Id.* at 208, 109 S.Ct. at 471 (citations omitted).

This broad dicta could indeed be cited for the proposition that *all* statutes—whether categorized as substantive or not—ought to be presumed to apply only prospectively, but it is significant that the Court itself has not subsequently concluded that this absolutist statement from *Bowen* is the final word on retroactivity. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 837, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990) (recognizing only that *Bradley* and *Bowen* are in "apparent tension"); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 661 n. 1, 109 S.Ct. 1384, 1388 n. 1, 103 L.Ed.2d 685 (1989) (relying on *Thorpe* for legal support for parties' concession that regulations should apply to that case). My colleagues, as they must, have also recognized that it is not our place to determine when one Supreme Court decision constructively overrules another, *see Rodriguez de Quijas v. Shearson/American Express*, 490

ditional rights. In *United States v. Security Industrial Bank*, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982), the Court held that section 552(f)(2) of the Bankruptcy Reform Act of 1978, which permits debtors to avoid liens on certain property, does *not* apply retroactively to liens which attached prior to the enactment date. The Court determined that section 552(f)(2) "could be read literally to divest property interests which had been created before the Act was enacted," *id.* at 80, 103 S.Ct. at 413, but it declined to do so. This case supports a supposition that the Court intended the "venerable rule" identified in *Bennett* to apply narrowly. The rights implicated in *Security Industrial Bank* were precisely those that *Bradley* identified as having "matured or become unconditional." It would be unfair, even under a narrow reading of the exception to the *Bradley* presumption, to upset these rights by the retroactive application of the law.

The only other case cited as a source of the "venerable rule" is *Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964). In *Greene,* the Court considered whether a new 1960 Defense Department regulation, which changed the qualifications for receiving monetary reimbursement by a contractor employee who had been wrongfully denied a security

clearance by the Defense Department, would apply to a case pending at the time it was issued or whether the 1955 regulation continued to apply. The Court held that "[w]hatever petitioner's rights are, *there can be no doubt they matured* and were asserted under the 1955 directive." *Id.* at 160, 84 S.Ct. at 621 (emphasis added). *Greene* had been cited by the Court in both *Thorpe,* 393 U.S. at 282, 89 S.Ct. at 526, and in *Bradley,* 416 U.S. at 717 n. 24, 720, 94 S.Ct. at 2019 n. 24, 2020, as an example of the exception to the general rule that courts are to apply the law in force at the time of their decisions. Because *Greene's* rights to his lost earnings had matured under the earlier regulation, it would be "manifestly unjust" to apply the new regulation retroactively. Thus, *Greene* also supports a narrow understanding of the substantive rights that *Bennett* understood the venerable rule to apply to. In light of the reference to these cases, one could plausibly interpret the venerable rule that *Bennett* meant to incorporate to be quite similar to the more limited exception to the *Bradley* presumption that a court should not apply a new law where such "an intervening change to a pending action ... would infringe upon or deprive a person of a right that had matured or become unconditional," *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020 (citing *Greene,* 376 U.S. at 160, 84 S.Ct. at 621).

U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989), and have determined that *Bowen* does not provide the governing rule for this case.

Apart from its dicta, *Bowen* is entirely consistent with the *Bradley* presumption; its facts simply fit within the exception for statutes that would alter the reasonable expectations of parties regarding the consequences of their past actions. A court ought not to presume that Congress intended, by authorizing HHS to promulgate rules, to permit the Secretary to apply those rules retroactively in a way that would upset the settled rights and expectations of the provider hospitals. The HHS rule in question "alter[ed] the *past* legal consequences of past actions," *id.* 488 U.S. at 219, 109 S.Ct. at 477 (Scalia, J., concurring) (emphasis in original), and upset the plaintiffs' reasonable expectations of how much they would be reimbursed for providing medical care. *See id.* at 220, 109 S.Ct. at 477–78 (noting that the agency rule violated the APA because it impermissibly upset reliance on past—as opposed to future—legal rules).

Obviously, *Bowen*s conclusion is also consistent with the substance/procedure dichotomy that the majority draws. Yet, given that the Court in *Bowen* did not purport to rely on such a distinction, we are also free to apply *Bradley*s core principle and look directly at whether retroactive application would upset reasonable expectations. Given the choice between the two, I believe that we should employ the *Bradley* rule because, as I have argued above, it best comports with the fundamental concerns underlying retroactivity law and avoids the inevitable inaccuracies engendered by reliance on the formal substantive/procedural distinction. At best, the substance/procedure dichotomy is a proxy for a direct examination of the justice of applying a new law to prior conduct in all cases, and I see no reason to use a proxy when *Bradley* provides us with the tools to make that determination directly.

The last of this line of Supreme Court cases also does not conflict with the continued use of the *Bradley* presumption. De-

spite Justice Scalia's exhaustive consideration of the retroactivity issue in his concurrence in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), his effort to do away with the *Bradley* presumption did not carry the day. The four Justices signing on to Justice O'Connor's majority opinion agreed that Congress clearly intended for the new law to apply only prospectively, and they did not feel it necessary to reconcile the line of cases in "apparent tension," because in either case, "where the congressional intent is clear, it governs." *Id.* at 837, 110 S.Ct. at 1577. The four dissenters in *Bonjorno* not only disagreed with the majority's reading of the statutory language and legislative history but reaffirmed their commitment to *Bradley* by applying it to the facts before them. *See id.* at 866–69, 110 S.Ct. at 1592–94 (White, Brennan, Marshall, & Blackmun, JJ., dissenting) (arguing that there is no manifest injustice in applying new postjudgment interest rate retroactively).

Finally, there are two recent cases in this circuit that have considered the presumption of retroactivity in the absence of clear legislative intent. In *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958 (D.C.Cir.1990), this court discussed whether the 1988 version of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibited the making of false statements about one's competitor's products as well as about one's own, should be applied to conduct occurring well before the effective date of the amendments. Alpo Petfoods alleged only that Ralston Purina made false representations about its own products, so the amendment, even if considered applicable, would have had no effect on the case. Nonetheless, the court included a long footnote of dicta in which it stated that the *Bowen* rule that congressional enactments will not be construed to have retroactive effect unless their language requires this result "seems more faithful to the older decisions that are being interpreted in the retroactivity debate." *Id.* at 964 n. 6.

Even had the retroactivity discussion been relevant to the outcome of *Alpo Petfoods*, the case clearly would have fallen

within the recognized exception to the *Bradley* presumption. Had Alpo actually accused Ralston Purina of misrepresenting Alpo's products, applying the law retroactively would have affected the parties' expectations about the legal consequences of their actions. It would have been unfair to Ralston Purina to apply a new rule to past conduct—conduct that, when it occurred, did not violate the Lanham Act. Under *Bradley*, a court would not presume that it was Congress' intention to work such an unfairness.

More recently, in *Wagner Seed Co. v. Bush*, 946 F.2d 918 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992), this court interpreted a provision of the Superfund Amendments and Reauthorization Act of 1986 that provided for reimbursement of the reasonable costs of complying with a clean-up order. The question was whether the provision applied to clean-up orders issued prior to the effective date of the amendments. The court concluded that the statutory provision was ambiguous, so it deferred to the EPA's interpretation under step II of *Chevron*. The court reasoned that the "obvious starting point for interpretation is the presumption against retroactivity" as articulated in *Bowen*. *Id.* at 924. It makes no mention of *Bradley*. But, like *Alpo Petfoods*, the provision at issue would, most likely, have fallen into the exception to the *Bradley* presumption. When Wagner Seed received the EPA's clean-up order, it had no expectation that it would be reimbursed for its costs. Indeed, the EPA fully expected that it would not be required to reimburse Wagner Seed for its clean-up of the hazardous wastes. By applying the reimbursement rule retroactively, the court would have upset the reasonable expectations of the parties concerning their rights and obligations under the law. Courts ought not to presume that such a frustration of reasonable expectations was the intended result.

The facts of both *Alpo Petfoods* and *Wagner Seed* fall comfortably within a clear exception to the *Bradley* presumption. Thus, to the extent that we are bound by them, *see* Maj.Op. at 897, they are consistent with the conclusion that the presumption remains the law in this circuit.

## II.

When a law purports to restore the status quo in existence prior to an intervening Supreme Court decision, the application of that law to conduct occurring prior to the decision would obviously not frustrate the expectations of the parties concerning the legal consequences of their actions at that time. To be sure, a court's authority to declare what the law *is* now has generally been held to include retroactively changing what the substantive law *was* before the court made its decision. *See* 1 WILLIAM BLACKSTONE, COMMENTARIES *69 (the duty of a court is not to "pronounce a new law, but to maintain and expound the old one"). *But see Linkletter v. Walker*, 381 U.S. 618, 636, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965) (rejecting automatic retroactivity in favor of balancing approach in which courts must examine (1) the purposes of the new rule; (2) the reliance placed upon the old rule; and (3) "the effect on the administration of justice of a retrospective application" of the new rule). When the Court determined in *Patterson* that post-formation conduct was not actionable under § 1981, it changed the substantive law applicable to Gersman and to GHA even though § 1981 had not been interpreted that way at the time GHA terminated the contract. *See* Beryl Harold Levy, *Realist Jurisprudence and Prospective Overruling*, 109 U.PA.L.REV. 1, 2 (1960) ("The parties acted yesterday but the law at which the court arrives today is the law which nonetheless covered yesterday's conduct."). This type of retroactive application of a Supreme Court decision is often unfair to parties that reasonably relied on their understanding of the law at the time they acted, but it is an unfairness that we tolerate for reasons of judicial administration and in order to preserve the "legal fiction" that courts do not make law and the practical discipline that many believe that fiction produces. *See James B. Beam Distilling Co. v. Georgia*, —— U.S. ——, ——, 111 S.Ct. 2439, 2451, 115 L.Ed.2d 481 (1991)

(Scalia, J. joined by Marshall, J. and Blackmun, J., concurring in the judgment) ("[T]hose difficulties [engendered by retroactivity] are one of the understood checks upon judicial law making; to eliminate them is to render courts substantially more free to 'make new law,' and thus to alter in a fundamental way the balance of responsibility and power among the three Branches."); Levy, *supra*, at 26 ("Neither the force nor the value of our inherited judicial methods should be underestimated. They are an implicit and constant discipline to any judge who might feel egocentrically licensed to go on a legislative rampage.").

But Congress need not share our tolerance of this unfairness. The fact that *Patterson* through a legal fiction retroactively changed the substantive law governing past conduct should not lead us to the conclusion that when Congress legislated, its intent was to defer to that fiction. Put another way, we should not assume that Congress accepts the unfairness caused by the retroactive application of a court decision when it seeks to reverse the effects of that very decision. Congress knows that, *Patterson* notwithstanding, parties like Gersman and GHA had certain reasonable expectations about the legal consequences of their actions back in 1987. Unless there is reason to believe otherwise, we should assume that Congress, when it legislated to restore the pre-*Patterson* status quo, intended to restore the rule that people actually governed their own affairs by. *See* Estrin, Note, *supra*, at 2071 ("When Congress restores the unsettling effects of unexpected judicial decisions, it provides stability and continuity to the law....").

All of this is a long way of saying that, if anything, the specific circumstances in which Congress enacted the law—the fact that the Civil Rights Act followed on the heels of *Patterson* and attempted to undo that decision—confirms that *Bradley* s generally applicable tenet that Congress should be presumed to act retroactively to the greatest extent consistent with reasonable expectations is the right canon to apply to this case, and that that canon leads us to the conclusion that § 101 should apply to this case. When the "new" law is nothing more than a reenactment of the law that governed the relevant conduct at the time it occurred, there is no "manifest injustice" in applying the new law to the past conduct, even where an intervening Supreme Court opinion redefined the substantive law. To the extent that the law prior to *Patterson* was the same as the law enacted in the Civil Rights Act, the application of § 101 of the Act to the facts of this case would not be "manifestly unjust," and the *Bradley* presumption should govern. Because the new law was the same as what the parties[4] reasonably understood the law to be before *Patterson,* there is no reason not to apply § 101 retroactively.

## A. *Supreme Court Precedent*

The Supreme Court's pre-*Patterson* guidance supports the proposition that the conduct at issue here would have violated § 1981, as it was interpreted before *Patterson.* In his *Patterson* dissent, Justice Stevens wrote that the

Court's repeated emphasis on the literal language of § 1981 might be appropriate if it were building a new foundation, but it is not a satisfactory method of adding to the existing structure. In the name of logic and coherence, the Court today adds a course of bricks dramatically askew from "the secure foundation of the courses laid by others," replacing a sense

---

**4.** Contrary to my colleagues' characterization, *see* Maj.Op. at 899, I do not suggest that the result in this case should turn on the subjective beliefs of these specific parties as to the rules governing their conduct. Rather, I believe that *Bradley* mandates an objective standard—that we must look to what these parties, and others similarly situated, could reasonably have believed the law to be at the time of their conduct. This is certainly not a novel inquiry for a court to make. For example, the Supreme Court's qualified immunity jurisprudence requires that courts routinely determine whether government officials "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Nor does such an inquiry lend itself to standardless determinations nearly as readily as the notoriously malleable substance/procedure dichotomy that the majority clings to. *See supra* pages 902–903.

of rational direction and purpose in the law with an aimless confinement to a narrow construction of what it means to "make" a contract.

*Patterson*, 491 U.S. at 222, 109 S.Ct. at 2396 (Stevens, J., dissenting). The "rational direction and purpose in the law" prior to *Patterson* clearly indicated that discriminatory conduct after the formation of a contract was actionable under § 1981.

In *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the Court considered whether a timely filing of a Title VII complaint with the Equal Employment Opportunity Commission ("EEOC") under Title VII tolls the running of the statute of limitations for a § 1981 action based on the same facts. The petitioner, who was black, filed a charge with the EEOC claiming that he had been discriminated against with respect to the company's seniority rules and job assignments. Over three years later, the EEOC issued its right to sue notice.

The Court concluded that the filing of the Title VII claim did not toll the applicable statute of limitations for the § 1981 claim. The Court explicitly recognized, however, that § 1981 would otherwise have been applicable to petitioner's situation. "Although this Court has not specifically so held, it is well settled among the Federal Courts of Appeals—and we now join them—that § 1981 affords a federal remedy against discrimination in private employment on the basis of race." *Id.* at 459–60, 95 S.Ct. at 1720. Thus, at a minimum, *Johnson* suggests that the Court, prior to *Patterson*, believed that § 1981 applied to conduct occurring after the formation of an employment contract.

One year later, in *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Court considered whether two white employees stated a claim under § 1981 when they alleged that they had been fired for misappropriating company property while a black employee, who was accused of a similar offense, was not fired. The Court stated that "[w]e have previously held, where discrimination against Negroes was in ques-

tion, that § 1981 affords a federal remedy against discrimination in private employment on the basis of race, and respondents do not contend otherwise." *Id.* at 285, 96 S.Ct. at 2581 (citing *Johnson*, 421 U.S. at 259–60, 95 S.Ct. at 1719–20). The Court went on to conclude that § 1981 applies to white employees claiming racial discrimination just as surely as it applies to black employees. More specifically, *McDonald* held that an allegation of a discriminatory *termination* of an employment contract states a cause of action under § 1981. *See id.* at 286–87, 96 S.Ct. at 2581–82.

As the *Patterson* Court recognized, however, "§ 1981 covers all types of contracts, not just employment contracts." *Patterson*, 491 U.S. at 183, 109 S.Ct. at 2376. The fact that the pre-*Patterson* case law governing contract terminations was largely developed in the employment context should not be interpreted as limiting § 1981's applicability to only certain kinds of contracts. *Patterson* itself has been interpreted to be applicable to cases outside the employment context, *see Gersman v. Group Health Ass'n*, 931 F.2d 1565, 1571 (D.C.Cir.1991), so there is no justification for holding that the pre-*Patterson* case law is limited to employment contracts.

### B. *Precedent from Other Circuits*

Further support for the argument that the law prior to *Patterson* considered non-employment discriminatory contract terminations to be actionable under § 1981 may be found in cases of the courts of appeals. In *Fiedler v. Marumsco Christian School*, 631 F.2d 1144 (4th Cir.1980), the court considered whether plaintiff had a cause of action under § 1981 to challenge the decision of a private Baptist school to expel a white student for having a "romantic relationship" with a black student. The district court had dismissed the § 1981 claim on grounds that the school had a bona fide religious belief that the Bible forbids interracial romance and that actions based on that belief are insulated by the First Amendment absent a finding of a compelling state interest. The Court of Appeals phrased the issue as whether "§ 1981 pro-

hibits a commercially operated, private, sectarian school from discriminating on the basis of race, specifically, *by terminating a contractual relationship* with a white student at the school because of her association with a black student at the same school." *Id.* at 1149 (emphasis added). The Court concluded that § 1981 did proscribe the school's conduct. Further, although *Fiedler* involved a termination, the court found the case "virtually indistinguishable from *Runyon v. McCrary,* [427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976),]" which had involved a denial of admission. *Id.* at 1150. To the court, the lone relevant distinction between the cases was the sectarian character of the school in *Fiedler. See id.*

In *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563 (7th Cir.1989), the court affirmed the district court's grant of the defendant's motion for summary judgment, concluding that there was no genuine issue of material fact in dispute concerning the plaintiff's claim that her contract to provide cable marketing services to a cable franchise grantee had been terminated because she was black. The court affirmed the summary judgment because plaintiff had not proffered direct evidence of discriminatory intent. *See id.* at 571. The court never suggested, however, that § 1981 might not apply to plaintiff's claims of discrimination in the termination of the contract. Rather, the court assumed that § 1981 would apply to the termination of a contractual relationship.

In *Gonzales v. Home Insurance Co.,* 909 F.2d 716 (2d Cir.1990), the court considered the effect of *Patterson* on plaintiff insurance agents' claims that the defendant insurance company had discriminated against them in the performance and termination of their agency contracts. Concerning pre-*Patterson* law, the court stated:

> Prior to *Patterson,* this Court and others had viewed discriminatory contract termination as falling within the prohibition of § 1981. The *Patterson* Court, though it did not otherwise address whether discriminatory termination is within the scope of § 1981, stated that the concept of contract formation does not encom-

pass "breach of the terms of the contract." In the wake of *Patterson,* courts have divided as to whether a viable claim for discriminatory termination of a contract may still be brought under § 1981.

*Id.* at 722 (citations omitted). The court went on to hold that the "run-of-the-mine claim that the termination of plaintiffs' contracts was discriminatory ... was properly dismissed in light of *Patterson." Id.* at 722. But the court's resolution makes it clear that such a claim would not have been dismissed prior to *Patterson.*

In *McKnight v. General Motors Corp.,* 908 F.2d 104 (7th Cir.1990), the court recognized that *Patterson* represented a clear break from prior law:

> In the end the [*Patterson* ] Court decided not to overrule *Runyon,* but in the course of its wideranging reexamination of section 1981 indicated (as it seems to us) that claims of racially motivated *discharge* are not actionable under that statute. *This result could not reasonably have been anticipated before the order setting the case for reargument.*

*Id.* at 108 (emphasis added). Judge Posner, writing for a unanimous panel, described *Patterson* 's interpretation of § 1981 and its partial overruling of *Runyon* as "peculiar and unexpected." *Id.*

## C. *D.C. Circuit Precedent*

Prior to *Patterson,* the law in this circuit was that discriminatory terminations of contractual relationships were actionable under § 1981. In *Banks v. Chesapeake & Potomac Telephone Co.,* 802 F.2d 1416 (D.C.Cir.1986), this court considered whether the proper statute of limitations for a claim arising under § 1981 was the three-year limitation period on personal injury actions or the one-year limitation period provided in the D.C. Human Rights Act. Appellant claimed that she had been discriminated against on the basis of both her race and her gender in the way she was trained, transferred, evaluated, suspended, and terminated. She originally had alleged violations of both Title VII and § 1981, but only her race discrimination claims under

§ 1981 were before the court on appeal. *See id.* at 1418 n. 2.

The district court had determined that even under the three-year statute of limitations, appellant's claims were barred. We disagreed, concluding "that appellant's suit, insofar as it challenged her *termination,* was timely filed under the three-year statute." *Id.* at 1418 (emphasis in original and footnote omitted). There was no suggestion that § 1981 did not apply to the termination of the contract. On the contrary, Judge Buckley argued in concurrence that " 'causes of action that may be brought under § 1981 are most analogous to *breach of contract* actions, employment grievances, and complaints for denial of the right to use public accommodations.' " *Id.* at 1439 (Buckley, J., dissenting in part) (quoting *Pender v. National R.R. Passenger Corp.,* 625 F.Supp. 252, 255 (D.D.C. 1985)) (emphasis added).

In a case decided four months before GHA terminated its contract with Gersman and CSI, this court affirmed a jury verdict awarding appellee reinstatement and back pay on her claim that she was forced to resign as a result of her employer's unlawful racial discrimination in violation of both Title VII and § 1981. *Anderson v. Group Hospitalization, Inc.,* 820 F.2d 465 (D.C.Cir.1987). Appellant never argued, nor did the court even consider, that § 1981 might not apply to the *termination* of a private contractual relationship.

### D. *Summary*

There can be no serious doubt that the law prior to June 1989—when *Patterson* was decided—was that § 1981 applied to the termination of private contracts. GHA filed its motion to dismiss on August 7, 1989, one month after *Patterson,* but almost one year after it filed its answer (August 25, 1988). GHA obviously did not expect to win a motion to dismiss before *Patterson* changed the law. It would not be unjust to GHA if § 101 of the Civil Rights Act were applied to its conduct in October 1987, because under the law of the Supreme Court, as well as that of this circuit (and others), CSI had a cause of action against GHA under § 1981 for discrimination on the basis of race in the termination of the contractual relationship.

### III.

Four other circuits have considered the question of whether certain parts of the Civil Rights Act of 1991 apply retroactively. In *Vogel v. City of Cincinnati,* 959 F.2d 594 (6th Cir.1992), the Sixth Circuit held that § 102—which provides for the recovery of compensatory and punitive damages in cases of unlawful intentional discrimination—does not apply to cases filed prior to November 21, 1991, the effective date of the Civil Rights Act. Adopting a *Chevron* analysis, the court relied heavily on the fact that the EEOC had issued a policy statement declaring that it would not seek damages under the Civil Rights Act of 1991 for events occurring before November 21, 1991. *Id.* at 598 ("In light of the ambiguity of the statute on its face and the lack of congressional guidance, the EEOC's decision to apply the 1991 Act prospectively appears reasonable.").

Of course, *Vogel* dealt with a different section of the Civil Rights Act, and there is no reason to assume that the same retroactivity rules must apply equally to all sections of the Act. Indeed, any analysis under *Bradley* must take into account the specific effect that each statutory provision would have on settled expectations. That is especially true in the case of the Civil Rights Act, where the explicit prohibitions against retroactive application of § 105 to the *Wards Cove* case and of § 109 generally suggest that Congress had no difficulty treating each section separately. Further, the EEOC policy statement to which the Sixth Circuit accorded such deference applies only to the retroactive imposition of damages. The argument for deference to the EEOC on the interpretation of the ambiguous damages provision further distinguishes that case from the one before us.

Finally, it is worth noting that the *Vogel* court had no reason even to consider the question of the retroactivity of the damages provision, for Vogel did not prevail on the merits of his constitutional challenge to

the consent decree. His entitlement to damages obviously depended on his prevailing on the merits. The *Vogel* court's retroactivity discussion is essentially dicta.

The question of § 101's retroactivity was squarely (and necessarily) addressed by the Eighth Circuit in *Fray v. Omaha World Herald Co.*, 960 F.2d 1370 (8th Cir.1992). Georgianna Fray claimed that her employer violated § 1981 when it failed to promote her and when it constructively discharged her. The court discussed the question under both *Bradley* and *Bowen*. Applying *Bradley*, the court recognized that "[t]his case does not fall within the 'manifest injustice' exception to *Bradley*'s presumption of retroactivity. Fray sought damages under § 1981 for discriminatory failure to promote and constructive discharge. The conduct at issue occurred before *Patterson, at a time when prior cases warned that such conduct could be actionable under § 1981.*" *Id.* at 1378 (emphasis added). The court stated further that the "retroactive application of § 101 to this pending case would neither alter the rights and expectations of the parties nor disturb previously vested rights." *Id.*

Nevertheless, the majority concluded that the President's veto of the 1990 version of the bill—and Congress' failure to override that veto—provided a sufficiently clear indication of a congressional intent against retroactive application to preclude reliance on the *Bradley* presumption. "When a bill mandating retroactivity fails to pass, and a law omitting that mandate is enacted, the legislative intent was surely that the new law be prospective only; any other conclusion simply ignores the realities of the legislative process." *Id.*[5]

My colleagues and I agree that this argument based on the legislative history is untenable. The retroactivity provision contained in the bill that President Bush vetoed was a *super-retroactivity* provision—

it would have applied § 101 "to all proceedings pending on or commenced after June 15, 1989," that is, it would have reopened cases in which judgment had entered prior to the effective date of the Civil Rights Act. The fact that the President vetoed this version (and that a two-thirds majority was unavailable to override) tells us nothing about the congressional intent concerning application of § 101 to cases pending on November 21, 1991.

In *Fray*, Judge Heaney argued in dissent that "[t]he Act's legislative history, even as the majority recounts it, clearly demonstrates that Congress was split on the question of retroactivity." *Id.* at 1380 (Heaney, J., dissenting). Judge Heaney sought to reconcile *Bradley* and *Bowen* by recognizing that they both are "based on an overriding concern for fairness." *Id.* at 1381. He concluded that a case involving civil rights, even among private parties, was "[i]ndisputably a 'great national concern' that merits a presumption of retroactivity." *Id.* Finally, Judge Heaney, like the majority, concluded that

[u]ntil the Supreme Court decided *Patterson* in 1989, there was every indication that the conduct that formed the basis of Fray's complaint was actionable under section 1981. During the period that Fray worked at the World Herald, the newspaper was on notice that section 1981 might apply to an employer's conduct over the course of the employment relationship. In this case, therefore, application of the Civil Rights Act of 1991 best serves the interests of fairness by restoring the rights of the parties as they were when Fray began her lawsuit.

*Id.* at 1381–82. The same, of course, could be said of GHA's conduct with respect to CSI and Gersman. The *Fray* majority's legislative history argument is entirely unpersuasive; when that is stripped away, as my colleagues and I agree that it should

---

5. The Eighth Circuit has subsequently relied on *Fray's* analysis to find that other sections of the Civil Rights Act do not apply retroactively. *See Parton v. GTE North, Inc.*, 971 F.2d 150, 155–56 (8th Cir.1992) (finding that 42 U.S.C. § 1981a(a)(1), which allows compensatory and punitive damages for intentional discrimination

cases not covered by § 1981, is not retroactive); *Huey v. Sullivan*, 971 F.2d 1362, 1365 (8th Cir. 1992) (finding that *Fray* prevents retroactive application of § 114 of the Civil Rights Act, which waived sovereign immunity for awards of interest under Title VII).

be, *Fray* supports the argument that applying § 101 to pre-*Patterson* conduct would not be unjust.

A few days before oral argument in this case, the Seventh Circuit decided *Mozee v. American Commercial Marine Service Co.*, 963 F.2d 929 (7th Cir.1992). There, the court first rejected the approach of the Eighth Circuit in *Fray*, concluding that "[a] clear indication of congressional intent cannot be deciphered from the legislative history of the 1991 Act's language. Without a clear indication of congressional intent in either the language of the 1991 Civil Rights Act or in the Act's legislative history, we must turn to judicially derived rules of construction in order to resolve this ambiguity." *Id.* at 934.

After acknowledging that "it is not within the province of the court of appeals to determine when Supreme Court decisions in one line of cases effectively overrule Supreme Court decisions in another line of cases," *id.* at 935 (citing *Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)), the court nonetheless overruled *Bradley* by implication:

> Considering that the *Bowen* presumption of prospective application is the historical rule of construction, and considering that the *Bowen* decision contains strong language reaffirming this historical rule of construction, we will assume that *Bowen* states the general rule. Therefore, we will only apply the *Thorpe–Bradley* presumption of retroactive application in a narrow category of cases.

*Id.* at 936. [6]

The court's evident preference for *Bowen* over *Bradley* led it to misread *Bennett*:

> [T]he *Bennett* decision could be read narrowly to mean that the *Thorpe–Bradley* line of cases does not apply to statutory provisions that affect matured property-like interests. However, considering that the *Bowen* presumption of prospective application is the general rule, we

conclude that *Bennett*, instead, stands for the proposition that statutory provisions impacting substantive rights and obligations will not be retroactively applied.

*Id.* The court believed that this broad reading of *Bennett* "assures that parties are accountable solely for the substantive law in effect at the time of their relevant conduct." *Id.* This is desirable because "it is unfair to hold private parties accountable for rules which were not in effect at the time in which the parties' relevant conduct took place." *Id.* This analysis, however, seems inherently contradictory since if the court were truly concerned about holding "parties accountable for rules which were in effect at the time" of their conduct, it would not have hesitated to apply § 101 of the Civil Rights Act to the parties in *Mozee.* As Judge Cudahy wrote in dissent,

> *Patterson* became the law for a short time as this case was inching through a thicket of litigation, and the opinion in this case as presently written assumes that it is still in effect. Now, however, Congress has chosen to erase *Patterson* from the books. So, as I write, the law is the same as that prevailing at the time the discriminatory events took place and at the time the lawsuit was filed. In other words, *Patterson* was the effective law of the land at no time that is relevant to the disposition of this case. *No one relied on it when liability was incurred in this case, nor can we rely on it now that it has been overruled by Congress.*

*Id.* at 941 (Cudahy, J., dissenting) (emphasis added).

One month later, the Seventh Circuit chose to revisit the identical issue that the *Mozee* court addressed. In *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225 (7th Cir.1992), Judge Posner concluded—somewhat at variance with the opinions he had expressed earlier in *McKnight, see supra* page 910—that the pre-*Patterson* legal landscape was "tentative," *id.* at 229, and

---

**6.** In *Banas v. American Airlines, Inc.,* 969 F.2d 477 (7th Cir.1992), the Seventh Circuit showed just how narrowly it intended to apply *Bradley.* There, the court said that *Bradley* would not be applied even where a new statute made a purely procedural change while the case was on appeal. *See id.* at 484.

that *Patterson* had "swept [it] away." *Id.* Additionally, according to the court, "it would be a considerable paradox to hold that the older the conduct complained of, the more securely the conduct is subject to the new statute." *Id.* Finally, Judge Posner expressed concern that it would be "too complex" and costly to administer a rule of retroactivity that depends on the date of the activity in question, and thus, on the parties' reasonable expectations. *See id.*

The rhetoric is seductive but the reasoning fallacious. First, Judge Posner's reading of the pre-*Patterson* law is unpersuasive. As demonstrated above, § 1981 jurisprudence was developed and consistent. Further, Judge Posner's reliance on the antiquity of the conduct is misplaced: the relevant inquiry is not age but the reasonable expectations of the parties at the time the conduct occurred. In a situation such as this one where legislation reverses a Court decision, it is inevitable that only the older conduct will be in reliance on the norm resuscitated by statute. Finally, *Luddington*'s arguments based on costs and administrability are also unpersuasive. Applying the *Bradley* presumption would not revive cases in which judgment has already been entered and appeals exhausted or which are barred by applicable statutes of limitations. The class of cases affected—those pending on November 21, 1991, in which the relevant conduct occurred prior to June 15, 1989—is not enormous (nor particularly old). Administering a rule based on reasonable, objective expectations and determining whether rights had "vested" under a particular legal regime are tasks with which courts deal every day; in this case, the inquiry would merely require that the court ascertain the date of the conduct in question, the same determination that the court would have to make when following the majority's rule.[7] It is not clear that that endeavor is any more a waste of judicial resources than the continued application of the dying *Patterson* re-

gime to any more pending cases than is equitably necessary. Lastly, even if the judiciary must undertake an extra burden, costs and administrative difficulties are not trumps, and, in this case, they seem well worth bearing in the service of fairness and justice for the parties.

Finally, the Fifth Circuit has also weighed in on the issue of the retroactivity of § 101 of the Civil Rights Act. In *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363 (5th Cir.1992), the court, after finding the legislative history unenlightening and the Supreme Court's guidance conflicting, fell back on the same substantive/procedural divide that my colleagues invoke. *See id.* at 1373–74. Again like my colleagues, Judge Higginbotham relied heavily on *Bennett*, stating that "the rule in *Bradley* was *limited* by 'another venerable rule of statutory interpretation, i.e., that statutes affecting substantive rights and liabilities are presumed to have only retrospective effect.'" *Id.* at 1374 (quoting *Bennett*, 470 U.S. at 639, 105 S.Ct. at 1560) (emphasis added). While I have already addressed what I believe to be the limitations in this argument, it is perhaps worth noting that in order to reach the conclusion that this language from *Bennett* provides the controlling rule, the *Uncle Ben's* court must replace the actual "comports with" language with its own more definitive "limited" term.

The Fifth Circuit did recognize the "anomaly" in finding that § 101 was not retroactive in the face of the fact that at the time of the conduct at issue, *"Patterson* had not yet been decided and, under the decisions of many lower courts, § 1981 applied to racial discrimination in promotions." *Id.* The court justified its failure to take this fact into account on the grounds that the defendant was entitled to the benefit of the fiction of the retroactivity of *Patterson*, lest the court be required to make "unwieldy distinctions" between

7.  Application of *Bradley* would require that conduct be divided into three categories: conduct occurring before *Patterson,* conduct occurring after *Patterson* but before the passage of the Act, and conduct occurring after the passage of the Act.  Under the majority's rule, conduct would

be split into two categories based on whether it occurred before or after the passage of the Act. Obviously, in either case, a particular course of conduct could continue through more than one period and thus require the application of more than one rule.

classes of litigants. *Id.* This argument ignores the fact that when Congress acts to restore the status quo—and thus parties' expectations—prior to the decisions, it is reasonable to presume that it meant to act retroactively. Additionally, the emphasis on "unwieldy distinctions" reprises Judge Posner's argument in *Luddington,* and the response is the same: drawing distinctions based on reliance is consistent with fairness to all the parties, is no different from the distinctions that the judiciary routinely makes, and is not measurably more awkward than interpreting and applying a legal regime that was only recently announced and that will soon die.[8]

### IV.

For the reasons discussed, I believe that § 101 of the Civil Rights Act should be applied retroactively to the facts of this case. It would not be unjust to apply § 101 because the parties back in 1987 must reasonably have expected that terminating a contractual relationship on the basis of race would have been actionable under § 1981. Because my colleagues, in their effort to fashion a bright line rule, have instead adopted a mechanical formulation that is at odds with the fairer and more fact-sensitive inquiry encapsulated in *Bradley,* I respectfully dissent.

---

**8.** The Fifth Circuit decisions that have followed *Uncle Ben's* do not provide any more persuasive authority in regard to the issue in this case. In *Rowe v. Sullivan,* 967 F.2d 186 (5th Cir.1992), the court, relying on the Eighth Circuit's opinion in *Vogel,* deferred to the EEOC's opinion that the Act's provision extending the statute of limitations for filing judicial actions under Title VII was not retroactive. In *Landgraf v. USI Film Products,* 968 F.2d 427 (5th Cir.1992), the court applied *Bradley* to the Act's provisions regarding jury trials and the availability of compensatory and punitive damages but concluded that retroactive application would work an injustice. *See id.* at 432.